

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| MIKERLANGE ALTIDOR AND BERNARDE ALTIDOR, | ) ) ) | No. ED107087 |
| Appellants, | ) ) | Appeal from the Circuit Court of St. Louis County |
| vs. | ) ) | Hon. Joseph L. Walsh |
| EDWARD G. BROADFIELD, MISSOURI METALS, LLC AND PERKINELMER, INC., | ) ) ) ) | |
| Respondents. | ) ) | Filed: May 21, 2019 |

This is an appeal from the entry of summary judgment in favor of the defendants on the plaintiffs' tort claims. We reverse in part and affirm in part.

## **Background**

Since 1957, a metal fabrication facility has been operated at 9970 Page Avenue ("the Site") in the Elmwood Park neighborhood in St. Louis County. It is undisputed that prior to 1988, toxic chemicals were dumped, spilled, leaked or otherwise released at the Site, which contaminated the soil and groundwater on the Site. Some of these contaminants have migrated off the Site, as shown by what the parties call a "migratory plume" of contaminants in the groundwater. The plume sits at the edge of the Site and partway into the Elmwood Park neighborhood. After 1988, the Site was owned by PerkinElmer Inc. and operated by Missouri Metals LLC. PerkinElmer was made aware of the existing

contamination at the Site and it has been engaged in remedial efforts with the Missouri Department of Natural Resources and the Environmental Protection Agency.

In the summer of 2015, several homeowners[1] in the Elmwood Park neighborhood filed individual petitions seeking damages for diminished property values caused by the migration of toxic chemicals and noise and dust from the Site onto their properties. Plaintiffs sued PerkinElmer, Missouri Metals and Edward Broadfield, as president of Missouri Metals. Plaintiffs claimed that toxic chemicals—specifically, perchloroethylene ("PCE") and trichloroethylene ("TCE") used for degreasing metal components—were spilled at the Site, contaminated the soil and groundwater at the Site and then migrated underground and onto Plaintiffs' properties. They alleged the air inside their homes was also contaminated via vapor intrusion. Plaintiffs also asserted that the Site produced excessive noise and dust that interfered with the enjoyment of their property.

The petitions asserted counts for premises liability, permanent and temporary nuisance, trespass and negligence against all three Defendants and a negligent supervision count against Broadfield, all relating to the alleged toxic contamination (the "toxic tort claims"). Plaintiffs asserted two distinct theories for holding these Defendants liable for the toxic contamination that ended up on their properties: (1) Defendants spilled contaminants at the Site after 1988, and for pre-1988 spills, Defendants were the corporate successor of the pre-1988 owner and (2) *even if* Defendants did not spill any contaminants at the Site, they had a duty upon acquiring the Site in 1988 to clean up and prevent the existing contamination from migrating into Plaintiffs' neighborhood, which they failed to do.

---

[1] The named plaintiffs who have appealed are Yvette Alexander, Lloyd Alexander, Mikerlange Altidor, Bernarde Altidor, Evelyn Campell, Cleola Green and Blanche Hennley.

Plaintiffs also asserted a private nuisance count against Missouri Metals relating solely to allegedly unreasonable amounts of noise and non-toxic dust coming from the operations at the Site (the "noise and dust claim"). They claimed that this unreasonable use of the Site by Missouri Metals was interfering with the enjoyment of their property and caused damages.

The cases were consolidated for discovery. Over the next several years, Defendants filed multiple motions for summary judgment on various grounds with respect to all claims against all Defendants. One of which was filed by all Defendants collectively and was titled "Motion for Summary Judgment on Causation" and was *only* directed at the toxic tort claims. Therein, Defendants argued their right to judgment on both of the alternate theories of liability: (1) there was no evidence that they caused any spills, all the spills at the Site occurred before 1988, and any spills after 1988 would not yet have reached Plaintiffs' property anyway and (2) there was no legal authority for holding Defendants liable for migration even if they did not cause the original spills and their actions in response to the contamination found on their property was reasonable anyway. This "Motion for Summary Judgment on Causation" was *not* directed at the noise and dust claim against Missouri Metals. The noise and dust claim was addressed in a separate motion filed by Missouri Metals only, in which Missouri Metals argued (1) Plaintiffs had no evidence that operations at the Site were an unreasonable use of the land and (2) the claim was barred by the statute of limitations.

The court entered summary judgment in favor of all Defendants on *all claims,* in other words on all the toxic tort claims and the noise and dust claim. As to the toxic torts claims, it is clear the judgment was based on the grounds set forth in Defendants' collective

3

motion titled "Motion for Summary Judgment on Causation" because the court expressly granted that motion in its judgment. That was the only motion expressly ruled on by the court. [2] Nevertheless by also entering summary judgment on the noise and dust claim, we must presume the court did so on one of the grounds set forth in the only motion for summary judgment directed at that claim—the one filed separately by Missouri Metals. *See Phillips v. Drury Southwest, Inc.*, 524 S.W.3d 228, 230 (Mo. App. E.D. 2017) (holding that where trial court does not specify reasons for summary judgment, we presume it was done on grounds specified in movant's motion.)

This appeal follows.

## **Scope of Appeal**

This case involves multiple claims on multiple theories against multiple defendants who have asserted multiple reasons for summary judgment. Thus, before we can address the merits, we must clarify what is and is not properly before us in this appeal.

First, Defendants suggest that we should dismiss the entire appeal due to numerous violations of Rule 84.04 in Plaintiffs' brief—primarily related to the lack of proper citations to the record—which they contend substantially impede our review. Plaintiffs counter that we should disregard Defendants' brief because of its numerous misrepresentations of fact in violation of Rule 84.04. The noted deficiencies have neither impeded our review nor the parties' ability to understand and respond to substantive arguments. We decline to dismiss the appeal or disregard the briefs in their entirety, preferring as always to address the merits of the appeal. But, with respect to both parties' factual assertions, where there

---

[2] There were three other motions for summary judgment collectively filed by Defendants on the toxic tort claims (and like the causation motion, did not apply to the noise and dust claim) based on statute of limitations, lack of valuation evidence and failure to assert cognizable claim and/or a lack of standing.

is either no citation to the record, a citation that does not include a specific page reference or a citation that directs us to a place in the record that does not contain that fact, we will not act as either parties' advocate and search for support for that assertion among the almost 100 documents filed in connection with the summary judgment motion.[3]

Second, it is important to note what has *not* been challenged on appeal.  In Points I, II and III, Plaintiffs challenge the judgment on the negligence, nuisance and trespass respectively.  Plaintiffs have not raised any challenge on appeal to the summary judgment entered on the premises liability claim against all Defendants nor the negligent supervision claim against Broadfield.  Their attempt, in a footnote, to make Point I applicable to "all claims" is insufficient to preserve any claim of error as to judgment on the premise liability or negligent supervision claims.  *See Mothershead v. Greenbriar Country Club, Inc.,* 994 S.W.2d 80, 83 (Mo. App. E.D. 1999).  There being no claim of error asserted as to those counts, the judgment thereon remains unchallenged.

Similarly, in Point IV, Plaintiffs challenge only one of the two bases for entering judgment on the noise and dust claim that were asserted in Missouri Metals's motion for summary judgment on that claim, leaving the other basis unchallenged.  As noted above, Missouri Metals's motion asserted that summary judgment was proper because (1) Plaintiffs lacked evidence of the "unreasonable use" element of a nuisance claim and (2) the claim was barred by the statute of limitations.  Plaintiffs only argue on appeal that they did, in fact, present evidence of an unreasonable use; they say nothing about the statute of limitations.  To reverse the entry of judgment on this noise and dust claim, we would have to find that *no* basis existed for entering it.  In other words, even if we agreed with Plaintiffs

---

[3] We will take the same approach when reviewing the citations in the summary judgment record.

5

that there was evidence of the unreasonable use element—and thus *that* ground was not a proper basis for judgment—we would have "no choice but to presume, in the absence of arguments to the contrary," that the statute of limitations ground was a proper basis for entering judgment. *See City of Peculiar v. Hunt Martin Materials, LLC*, 274 S.W.3d 588, 591 (Mo. App. W.D. 2009); *see also Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 178 (Mo. App. S.D. 2004); *McGathey v. Matthew K. Davis Trust*, 457 S.W.3d 867, 877–79 (Mo. App. W.D. 2015). As such, we need not address the merits of the unreasonable use element argument and must affirm the judgment on the noise and dust claim without further discussion.

Third, certain issues have simply not been preserved. Point V, in its entirety, preserves nothing for our review. It states:

> The trial court erred in granting [Defendants'] motion for summary judgment as [Plaintiffs] because the summary judgment did not consider the weight of the evidence that show a material fact did exist for a jury to find [Defendants] liable on [Plaintiffs'] claims and the cumulative affect of the courts ruling deprived [Plaintiffs] of a fair trial.

(grammatical and spelling errors in original). The argument on this point begins with citations to multiple inconsistent standards of review—for summary judgments, for court-tried cases, for granting a new trial on cumulative trial errors—only one of which is applicable. Plaintiffs then assert various disjointed legal arguments, some of which are clearly misplaced under the standards for a summary judgment.[4] We cannot—without

---

[4] "The Verdict was made without the evidence, it was against the weight of the evidence and wholly unfair;" summary judgment on the merits was not warranted because there was a genuine issue of material fact; the motion for summary judgment did not comply with Rule 74; to the extent the trial court adopted the Defendants' facts, which were "factually wrong" and "highly contested," and made a finding based thereon that there was no causation, that was against the weight of the evidence; the material facts demand instead that the court find Defendants liable and proceed to a jury trial on damages only; due process has been denied; the court's "rulings are incorrect both legally and factually because factually the raise an issue of genuine issue of material fact and legally the Judgment of the Court cannot be affirmed because it is not supported by

acting as their advocate and reconstructing this point and argument for Plaintiffs—decipher any basis for relief amidst this legal nonsense. *See generally Nicol v. Nicol*, 491 S.W.3d 266, 270–71 (Mo. App. W.D. 2016); *see also Avis Rent-A-Car Systems, Inc. v. Howard*, 133 S.W.3d 122, 124 (Mo. App. E.D. 2004). Any arguments in Point V relating to an error in the granting of summary judgment have been abandoned, and we will not review this point.

Also unpreserved are issues raised for the first time on appeal in a reply brief. Defendants filed a motion to strike a portion of Plaintiffs' reply brief, which raised a claim of error relating to corporate successor liability that was not raised in Plaintiffs' opening brief. *See Hollins v. Capital Solutions Investments I, Inc.*, 477 S.W.3d 19, 23 n. 3 (Mo. App. E.D. 2015). That motion is granted, but we discuss the merits of that important issue *ex gratia* herein.

We now proceed to review the merits of only those arguments properly raised in the opening brief in Points I through III with respect to the entry of summary judgment on the toxic tort claims of nuisance, trespass and negligence against all Defendants.

### Summary Judgment Standard

The propriety of summary judgment is purely an issue of law. *M.C.-B. ex rel. T.B. v. Hazelwood School District,* 417 S.W.3d 261, 264 (Mo. App. E.D. 2013). Accordingly, our review of a summary judgment is essentially de novo, and the standards we employ to determine the propriety of granting the motion for summary judgment are no different than

the evidence;" "the cumulative nature of the Courts error amounts a denial of [Plaintiffs'] rights." (grammatical and spelling errors in original).

We leave uncorrected the spelling and grammatical errors not to embarrass counsel who prepared the brief, but to demonstrate how such errors—rampant throughout the briefing—impede our ability to comprehend what assertions are being made, much less whether they provide a legal basis for relief.

those applicable in the trial court. *See id.* To be entitled to summary judgment, Defendants were required to show that there was no genuine dispute as to the material facts upon which it was relying for summary judgment and that, based on those undisputed facts, they were entitled to judgment as a matter of law. Rule 74.04; *see also ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation,* 854 S.W.2d 371, 376 (Mo. banc 1993). As the defending party, Defendants could establish a prima facie case for summary judgment by showing (1) undisputed facts that negated any one of Plaintiffs' required proof elements, (2) the inability of Plaintiffs after an adequate period of discovery to produce evidence sufficient to allow the trier of fact to find the existence of any one of his required proof elements or (3) no genuine dispute as to the existence of each of the facts necessary to support an affirmative defense properly pled by the movant. *See generally Williams v. Missouri Highway and Transportation Commission,* 16 S.W.3d 605, 610 (Mo. App. W.D. 2000). To defeat a prima facie case for summary judgment, the non-movant must show—by specific references to affidavit, depositions, answers to interrogatories, or admissions on file—that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed. *Brown v. Morgan County*, 212 S.W.3d 200, 202–03 (Mo. App. W.D. 2007). "A 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *See ITT*, 854 S.W.2d at 382. We must view the record in the light most favorable to the non-moving party. *Id.* at 376.

To be entitled to summary judgment here, Defendants must show that they are entitled to judgment as a matter of law on every viable theory pled by Plaintiffs. *See Sloss v. Gerstner*, 98 S.W.3d 893, 897 (Mo. App. W.D. 2003). Again, there were two distinct

theories on which Plaintiffs sought to hold Defendants liable: (1) causing the spill of contaminants on Site in the first place, or standing in the shoes of those who did under a corporate successor theory, and (2) failing to clean up and prevent migration of the contaminants off the Site, even if they had not caused them to be spilled there. Plaintiffs alleged that spilling the contaminants at the Site and failing to prevent their migration was: a breach of Defendants' duties constituting negligence; an unreasonable use of Defendants' property, which interfered with the use of Plaintiffs' property, constituting a nuisance; and an invasion of their property without their permission, constituting a trespass.

We conclude that Defendants have established the right to summary judgment as a matter of law only with respect to the first of Plaintiffs' two theories of liability for the toxic tort claims:

(1) Defendants are entitled to judgment on the theory that they caused the spill of contaminants because (a) the record establishes that no spills occurred after 1988 and (b) Defendants were not the corporate successor of the pre-1988 owners and cannot be held liable for the pre-1988 spills.

(2) Defendants are not entitled to judgment on Plaintiffs' alternative theory that, even if Defendants did not spill the chemicals, they were responsible for cleaning up and preventing migration of the contamination off the Site because the only two grounds asserted in the motion for summary judgment with respect to this theory fail: (a) Defendants did not demonstrate that this theory of liability was clearly foreclosed by binding precedent and (b) the undisputed evidence does not show that Defendants' regulatory remediation efforts were reasonable as a matter of law such that tort liability was prohibited.

9

**Theory 1:  Defendants Caused Toxic Chemicals to be Spilled at the Site**

Plaintiffs are, of course, required to prove that Defendants' conduct was an actual cause (also known as cause-in-fact) and the proximate cause of Plaintiffs' damages. *See Spencer v. American Airlines, Inc.*, 553 S.W.3d 861, 870–71 (Mo. App. E.D. 2018). Thus, Plaintiffs were required to show that their property damage would not have occurred "but for" Defendants' conduct and that those damages are the reasonable and probable consequence of Defendants' conduct.  *See id*.

Defendants asserted they were entitled to summary judgment because the undisputed evidence showed that all spills of contaminants on the Site pre-dated Defendants' ownership in 1988.  They also asserted that there was no corporate affiliation between the pre-1988 owners of the Site and Defendants, such that they could be held responsible for the pre-1988 "historical contamination" under a theory of corporate successor liability.  Finally, they claimed that even if there were spills of toxic chemicals after 1988, undisputed evidence showed those contaminants could not yet have migrated onto Plaintiffs' properties.  Plaintiffs had no experts and nothing more than inadmissible regulatory agreements to establish causation, Defendants claimed.  Because the evidence showed they did not cause any contaminants to be spilled that could have yet reached Plaintiffs' property, Defendants argued, the causation element of Plaintiffs' claims was negated.  Plaintiffs argue on appeal that they have produced "ample evidence" to withstand summary judgment.  We disagree.

There were no spills at the Site after 1988

No one disputes that toxic chemicals had been dumped, spilled, leaked or otherwise released at the Site at some point prior to 1988, which contaminated the soil and

groundwater on the Site. But Defendants have demonstrated that after 1988, there were no chemicals spilled at the Site—no spills, no dumping, no leaking of chemicals when they owned the property. Defendants supported this assertion of uncontroverted fact with the depositions of an environmental consultant and of an engineering consultant. These witnesses testified that there were documented spills of contaminants at the Site before 1988, but none since. Plaintiffs failed to sufficiently contest this fact in their response. None of the numerous exhibits they cite in support actually contain any information about spills or other releases of contaminants on the Site after 1988. The bulk of the exhibits they cite—most in their entirety, without page references—relate to the contamination found *on Plaintiffs' property* and have nothing to do with spills or releases of contaminants *on the Site* after 1988. They also cite exhibits that at most demonstrate that TCE and PCE were still *used* at the Site into the early 1990s, but that do not document a *spill* of those substances causing contamination at the Site. For instance, an EPA determination that PerkinElmer "contributed to the handling, storage, transportation and/or disposal of solid and/or hazardous wastes" at the Site and other EPA findings having nothing to do with *spills* of anything that contaminated the soil and groundwater at the Site.

Even if there were spills after 1988, they could not have reached Plaintiffs' property yet

Defendants have also demonstrated that there is no genuine dispute that the migratory plume is comprised solely of contaminants that were spilled on the Site prior to 1988. This assertion of fact was also supported by the engineering consultant's deposition, in which he described how slowly these contaminants and the groundwater travel. So, *even if* some contaminants had been spilled on the Site after 1998, those could not be part of the

11

migratory plume that Plaintiffs claim is contaminating their property. Plaintiffs responded to this fact by stating that testing and sampling by MDNR and EPA controverts the assertion that migration was limited to contaminants spilled prior to 1988. Again the bulk of the exhibits Plaintiffs cite have nothing to do with the source of the contaminants in the migratory plume, but only to the fact of contamination on Plaintiffs' property. Again, while some of the exhibits show that TCE and PCE were still being *used* at the Site into the 1990s, that does not contradict the assertion that the source of the contaminants migrating from the Site is entirely pre-1988 spills.

The undisputed material facts establish that Defendants did not spill any contaminants on the Site. All such spills at the Site pre-dated 1988, when Defendants acquired it.

We turn to whether Defendants can, nevertheless, be held liable for those spills on the basis of corporate successor liability. Defendants' motion for summary judgment asserted that there was no corporate affiliation between the pre-1988 owners of the Site and Defendants, such that they could be held responsible for the pre-1988 spills under a theory of corporate successor liability. As discussed at the outset of this opinion, Plaintiffs failed to properly preserve a challenge to this basis for summary judgment on appeal because it was not raised in their opening brief. *Ex gratia*, we conclude that Plaintiffs presented no evidence to establish corporate successor liability.

<u>Defendants were not the corporate successors of the pre-1988 owner of the Site</u>

The basic history of the Site's ownership is not genuinely disputed. An entity called Missouri Metals Shaping Company ("MMSC") began a metal fabrication operation at the Site in 1957. MMSC was a business division of Alco Standard Corporation. In April of

1988, Alco entered a purchase agreement with EG&G, Inc. and its subsidiary EG&G Missouri Metal Shaping Company, which had been formed in March of 1988 for the purpose of this acquisition, (collectively "EG&G"). In the purchase agreement, Alco sold the assets of the MMSC business to EG&G. EG&G changed its name to PerkinElmer Inc.—it appears in the late 1990s—and Missouri Metals, LLC was formed in 2001.

In general, "where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former." *Edwards v. Black Twig Marketing and Communications LLC*, 418 S.W.3d 512, 520 (Mo. App. E.D. 2013). There are four exceptions to the general rule of non-liability, two of which Plaintiffs asserted here in response to Defendants' motion for summary judgment on this issue: (1) when the purchaser expressly or impliedly agrees to assume *all* of the seller's debts and liabilities and (2) when the purchaser is merely a continuation of the seller. *See id.*

To be clear, if Plaintiffs cannot show the first link of corporate successor liability—running from the seller Alco and MMSC to the buyer EG&G at the time of the 1988 transfer—then no such liability for pre-1988 spills would trickle down the corporate chain to PerkinElmer, which appears to be merely the new name of EG&G. It is unclear on what basis Plaintiffs would link Missouri Metals to EG&G, but we need not concern ourselves with that because Plaintiffs have no proof of the first link of corporate successor liability.

Plaintiffs claimed that the purchase agreement itself showed the "purchase of substantially all the assets and an acceptance of liability." In fact, the agreement shows that EG&G expressly *did not* assume all of the liabilities of the MMSC business. Rather, the agreement expressly provided for only *limited* assumptions of liability by the purchaser.

13

This evidence flatly contradicts the existence of the first exception to non-liability. *See Osborn v. Prime Tanning Corporation*, 2011 WL 13291159, at *7 (W.D. Mo. April 29, 2011) (applying Missouri law, holding buyer-corporation did not expressly or impliedly agree to assume all liabilities of seller-corporation where agreement enumerated only a limited number of liabilities being assumed by buyer).

Likewise, Plaintiffs have failed to show any of the factors that might establish that EG&G was a "mere continuation" of Alco or MMSC. In determining whether a successor company "is merely a continuation" of the predecessor company—and thus liable for its debts—courts consider the following:

> (1) [w]hether there is common identity of officers, directors and stockholders; (2) whether the incorporators of the successor also incorporated the predecessor; (3) whether the business operations are identical; (4) whether the transferee uses the same trucks, equipment, labor force, supervisors and name of the transferor; and (5) whether notice has been given of the transfer to employees or customers.

*State ex rel. Family Support Division v. Steak'm Take'm LLC*, 524 S.W.3d 584, 591 (Mo. App. W.D. 2017). Plaintiffs relied on the fact that the Site has been consistently operated as a metal fabrication facility since the 1950s and EG&G carried on that operation using the same assets as MMSC, all of which it purchased in 1988. Defendants' uncontroverted evidence showed, however, that EG&G took steps to dispel any notion that it was merely a continuation of MMSC and there was no overlap of corporate structure, organization or management. *See, e.g, Chemical Design, Inc. v. American Standard, Inc.,* 847 S.W.2d 488, 493 (Mo. App. E.D. 1993) (finding no mere continuation under similar facts). Defendants supported these assertions with the affidavit of a PerkinElmer corporate representative who stated that EG&G had different officers, directors, and stockholders than Alco; that creditors, customers and employees who were retained after EG&G acquired the Site were

14

made fully aware of the change in ownership; and that stock in EG&G was not issued to retained employees or management. Plaintiffs' attempt to contradict this evidence failed. They cited testimony regarding the *internal* affiliation between the EG&G entities and regarding Broadfield's recruitment from self-employment to EG&G in 1988. This testimony is not probative of whether EG&G was a mere continuation *of Alco or MMSC*. They also cited EPA and MDNR documents that could not possibly be competent evidence of the corporate relationship of the relevant entities. In short, Plaintiffs have shown little more than the similarity in the entities' names to support their corporate successor liability argument.

The undisputed material facts show that Defendants cannot be held responsible for pre-1988 spills of contaminants at the Site based on corporate successor liability. As such, Defendants satisfied their burden to demonstrate their right to judgment as a matter of law with respect to any claims based on the theory that Defendants spilled contaminants at the Site: there is no evidence they caused any spill and no corporate successor liability.

We turn now to the other theory of liability on which Plaintiffs' claims were based: that even if they did not spill anything at the Site, Defendants nevertheless had a duty as owners and operators of the Site to clean up and prevent migration of contamination from their property off the Site.

### Theory 2—Even If Defendants Did Not Cause Spills, They Failed to Prevent Migration of Contaminants Off-Site

As noted earlier in this opinion, to succeed Defendants must show that they are entitled to judgment as a matter of law on every viable theory pled by Plaintiffs. *See Sloss*, 98 S.W.3d at 897. And we can only affirm the summary judgment on a ground that was actually raised in the motion and supported by the summary judgment record. *See*

15

*generally Burian v. Country Insurance and Financial Services*, 263 S.W.3d 785, 788 (Mo. App. E.D. 2008). Therefore, we must determine what grounds were raised in Defendants' motion with respect to this "even if" theory. A careful reading of Defendants' motion for summary judgment and supporting memoranda reveals that the only grounds asserted for summary judgment regarding this alternative theory of liability were: (1) there is no legal authority for holding Defendants liable for cleaning up contamination they did not cause and (2) there is undisputed evidence that Defendants acted reasonably in response to that contamination.

Defendants asserted at oral argument that their motion for summary judgment challenged the evidence of causation with respect to all claims and all theories. We disagree. Though the motion purported—in its title and by way of generalized language throughout—to be based on a lack of causation with respect to all claims, the substance of the "causation arguments" was entirely focused on only one of the two theories under which Plaintiffs asserted those claims: Plaintiffs' failure to provide evidence that Defendants caused any spills. Those causation arguments included the failure of Plaintiffs to show that Defendants had spilled anything during their ownership, failure to show corporate successor liability for pre-1988 spills, failure to prove with expert testimony that any hypothetical post-1988 spills had reached Plaintiffs' property yet and failure to establish causation by anything more than inadmissible EPA and MDNR documents. *After* making these arguments, Defendants addressed Plaintiffs' "alternate proposition" that even if Defendants did not cause any spills, they were liable for failing to prevent the migration of the contaminants. On that alternate proposition, Defendants asserted only (1) the lack of legal authority for it and (2) the reasonableness of their remedial actions as negating a

16

finding of tort liability on that theory. Defendants have failed to establish a right to judgment based on either of these grounds.

As to the legal authority for Plaintiffs' theory, a defending party can establish a right to summary judgment as a matter of law if it can show that the plaintiff's theory of liability is clearly foreclosed by applicable binding precedent. *See Frank v. Mathews*, 136 S.W.3d 196, 205 (Mo. App. W.D. 2004). Here, Defendants claim there is no legal authority for this theory, but they cite nothing in support. Rather, they merely argued in the motion for summary judgment that Plaintiffs' reliance on an unreported federal district court case applying California law did not support the proposition that Defendants are liable for the failure to clean up contamination even if they did not cause it. They contended, correctly, that the case was not binding authority in Missouri and, again correctly, pointed out that it was distinguishable because it involved the spill of PCE *during* the defendant's ownership of the property. No matter how correct these arguments were, demonstrating that an irrelevant and non-binding case from another jurisdiction does not support Plaintiffs' theory does not equate to establishing that there is no legal authority for that theory. Plaintiffs' theory was simply that, as owners and operators of a Site on which there was known contamination, Defendants were liable to their neighbors in nuisance, negligence and trespass—causes of action with abundant legal authority—because they failed to contain that contamination and keep it from migrating onto their property. Defendants could only establish that these theories were not viable by showing that they were precluded by case law or statute. *See id.* (reversing summary judgment where movant could not establish by statute nor common law that plaintiff's theory of liability was

17

precluded). Since Defendants did not meet that burden, we cannot say as a matter of law that Plaintiffs' theory lacked legal authority.

Defendants' assertion that the undisputed facts establish the reasonableness of their conduct in response to the historic contamination on the Site is equally without merit. It is undisputed that when the Site was transferred in 1988, PerkinElmer was made aware of the existing contamination at the Site, and an environmental consulting service was hired in the early 1990s. It is undisputed that PerkinElmer's was engaged in remedial efforts at some point under a 1994 Consent Decree with the MDNR and under a 2012 Administrative Agreement with the EPA. Defendants argued in the motion for summary judgment that because they "acted reasonably and consistent *with regulatory expectations* since acquiring the Site," that negated Plaintiffs' *tort* claims. (emphasis added).

The evidence Defendants cited in support of this basis for summary judgment simply does not establish, as a matter of law, the reasonableness of their conduct. Defendants cited a statement in the 1994 MDNR Consent Decree that PerkinElmer had "taken prudent measures to eliminate and remediate the source of contamination at the Site" and had "agreed to implement such further remedial measures." They then cited the deposition of an MDNR project manager assigned to the Site who, when asked if he agreed with those statements in the Consent Decree, answered "I think that PerkinElmer has taken prudent measures to further remedial actions." This opinion of one MDNR employee about unspecified actions at unspecified times does not establish as a matter of law that everything PerkinElmer did in the 30 years since it acquired the Site, and everything Missouri Metals or Broadfield has done during its operation of the Site, was reasonable.

18

Defendants also cited evidence for the proposition that they have wholly complied with everything required of them in the MDNR and EPA agreements. They claimed that the MDNR project manager testified PerkinElmer "never refused to comply with government requests," but his testimony was not that broad. The witness stated merely that PerkinElmer never refused to do work MDNR asked it to do *on the ground that PerkinElmer believed there was another source of contaminants*. Defendants claimed this witness also said PerkinElmer "has complied with the Consent Decree and [the 2012 EPA Administrative Order] requirements," but he said only that was "not aware of any" violations of the EPA Administrative Order. One agency employee's lack of awareness as to violations of a different agency's order does not establish compliance with that order. Defendants also cited evidence that MDNR never had to invoke the dispute resolution program provided for in the Consent Decree with PerkinElmer, that Defendants entered these agreements voluntarily and that all of their actions needed agency approval. We fail to see how any of these facts are probative of whether what Defendants actually did or did not do was reasonable.

Defendants also asserted that "the record establishes that any contamination in the neighborhood had already started to migrate off-site" before they acquired it in 1988. But the portion of the record Defendants cited in support of this fact is a flyer advertising a public meeting for residents of Elmwood Park regarding contamination at the Site. The flyer references some unidentified soil and groundwater sampling in 1998 that supposedly showed that some TCE contamination had migrated off-Site. This is hardly probative of when migration of contaminants began, much less would this be competent evidence of

Defendants' assertion that it began before they acquired the Site. Even if it did, Defendants have not shown how that demonstrates the reasonableness of their conduct.

Even if the above facts are undisputed, "different minds might reasonably draw different conclusions" from them. *See Bryan v. Missouri State Highway Patrol*, 963 S.W.2d 403, 406 (Mo. App. W.D. 1998). Therefore, Defendants have failed to show that these facts, as a matter of law, establish the reasonableness of their behavior. Moreover, even if their remedial efforts were reasonable in the context of the applicable *regulatory* standards, Defendants have failed to demonstrate that this evidence would negate an element of Plaintiffs' *tort* claims. In fact, Defendants have insisted all along that Plaintiffs cannot use the EPA and MDNR documents as evidence of Defendants' liability for these tort claims because those remedial efforts with the MDNR and EPA are governed by regulatory standards different than those that govern tort claims. *See Martin v. Commercial Metals Company*, 138 S.W.3d 619, 626 (Tex. App. 2004) (cited by Defendants, holding that environmental laws governing regulatory agreements are "directed toward the unique ends of cleaning up hazardous sites and apportioning costs for the clean-up" and are "very different from the standard of common law negligence in Texas.") Yet Defendants sought to negate an element of Plaintiffs' tort claims based on the reasonableness of their conduct under those same EPA and MDNR regulatory schemes. Defendants have provided no authority for the proposition that their remedial efforts under regulatory schemes can be used only as a shield, but not as sword, in a tort case. Thus, even if those remedial efforts were as a matter of law "reasonable" in the regulatory sense, Defendants have not established how that fact gives them a right to judgment on these tort claims.

Defendants failed to demonstrate that this theory of liability was not legally viable, failed to establish that their conduct under the EPA and MDNR agreements was reasonable as a matter of law and did not show how reasonable regulatory behavior negated any element of Plaintiffs' tort claims. Thus, they have not established a right to summary judgment on Plaintiffs' claims based on the theory that Defendants were responsible for, and failed to, clean up and prevent the migration of historical contamination.

**<u>Conclusion</u>**

To the extent Points I, II and III raised error with respect to the entry of summary judgment on claims that were based on Defendants' failure to clean up and prevent the migration of historical contamination, those points are GRANTED. In all other respects, those points and all others are DENIED. Defendants' motion to strike the successor liability portion of Plaintiffs' reply brief is GRANTED.

The judgment is REVERSED IN PART AND AFFIRMED IN PART as follows:

The judgment entered on the nuisance, negligence and trespass claims (asserted against all Defendants) is REVERSED to the extent those claims were based on Defendants' failure to clean up and prevent the migration of historical contamination. The judgment entered on the nuisance, negligence and trespass claims (asserted against all Defendants) is AFFIRMED to the extent those claims were based on Defendants spilling chemicals or being the corporate successor of those who had spilled chemicals at the Site.

The judgment entered on the noise and dust nuisance claims (asserted against Missouri Metals only) is AFFIRMED.

The judgment entered on the premises liability count and the negligent supervision count were not appealed.

21

The case is remanded for further proceedings consistent with this opinion.

ROBERT G. DOWD, JR., Judge

Philip M. Hess, P.J. and
Mary K. Hoff, J., concur.